UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
          :
YOSEF MAGID and JACOB ROTTENBERG,    :
          :
                           Petitioners,    :          19-CV-11516 (JMF)
          :
      -against-    :
          :          <u>OPINION AND ORDER</u>
ARI WALDMAN,    :
          :
                           Respondent.    :
          :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Yosef Magid and Jacob Rottenberg (together, "Petitioners") petition to confirm an arbitration award (the "Award") entered in their favor and against Respondent Ari Waldman. Waldman opposes the petition and petitions to vacate the Award on the ground that the arbitrator was partial. Waldman also argues that the arbitrator exceeded his power by granting Petitioners attorney's fees in connection with the litigation in this Court. The arbitrator's conduct was certainly troubling in some respects, but given the deference this Court owes when reviewing an arbitration award and Waldman's failure to timely and adequately raise the issues he now raises, the Court concludes that the Award — with the exception of the reward of attorney's fees — must be confirmed. Accordingly, and for the reasons stated below, Petitioners' petition to confirm the Award is granted in part and denied in part, and Waldman's cross-petition to vacate the Award is granted in part and denied in part.

## BACKGROUND

In or about November 2016, Petitioners approached Waldman regarding his $6.3 million-dollar property in Bayonne, New Jersey. *See* ECF No. 18 ("Waldman Decl."), ¶¶ 3, 4. At the

time, Waldman owned half of the property; his partner in the development venture owned the other half. *See id.* ¶ 3. On February 2, 2017, Petitioners and Waldman entered into an agreement concerning the development, and Petitioners planned to buy out Waldman's partner. *See* ECF No. 3 ("Pet. to Confirm"), ¶ 10. The parties disagree, however, about the terms of the agreement. According to Waldman, Petitioners agreed to provide "funds and management" for his development. Waldman Decl. ¶ 4. He claims that the parties procured a loan to buy out his partner and that they "structured" the investment so "Petitioners retained control of the property in order to develop it." *Id.* ¶ 5. Petitioners, by contrast, contend that the contract effected a sale of Waldman's interest in the development to Petitioners. *See* ECF No. 9-1 ("Magid Aff."), ¶ 3. Their differing interpretations resulted in this dispute, as Petitioners sold Waldman's interest in the property "at par value" while Petitioners retained their interest. Waldman Decl. ¶ 6.

Petitioners explained to Waldman that they had to sell a portion of the ownership in the property because "they had losses and expenses." *Id.* ¶ 6. Suspicious, Waldman retained legal counsel, Moshe Katlowitz, to investigate, beginning with a review of the partnership's books and records. *Id.* ¶ 7. Petitioners hired Rabbi Fichel Rabinowitz, who contacted Waldman and suggested submitting the dispute with Petitioners to arbitration. *Id.* ¶ 10. Rabbi Rabinowitz encouraged Waldman to meet Rabbi Gavriel Stern, who "acts in the capacity of a Rabbinical Attorney and arbitrator." *Id.* ¶ 15. Waldman met with Stern, who "insisted that he meet [Waldman's] attorney" and discuss his "claims and strategy." *Id.* ¶ 17. Thereafter, Waldman, Katlowitz, and Stern met at Katlowitz's office, discussed Waldman's "entire case, including confidential information covered by attorney client privilege," *id.* ¶ 18, and Stern "convinced" Waldman to submit the dispute to arbitration before Yoel Tzvi Liebermann ("Liebermann" or the "Arbitrator"), *id.* ¶ 20. On October 10, 2018, Petitioners and Waldman entered into an

agreement to submit the dispute to arbitration before Liebermann, *see* ECF No. 5, at Ex. A (the "Agreement"), and the arbitration began that day, *see* Pet. to Confirm ¶ 16.

According to Waldman, Stern "held himself out to be [Waldman's] attorney." ECF No. 30 ("Waldman Reply Decl.") ¶ 2; *see also* Waldman Decl. ¶ 28 ("Stern represented that he was acting as [Waldman's] advocate . . . ."). During the course of the proceedings, Stern engaged in *ex parte* communications with the Arbitrator. *See* Waldman Decl. ¶ 27. When confronted, Stern "assured [Waldman] that the adversaries had consented" to such communications. *Id.* "As the Arbitration progressed," however, it began to appear that the Arbitrator was acting through Stern. *Id.* ¶ 30. For example, Stern himself sent emails "relating to deadlines and submissions," *id.*, including one email dated October 31, 2018 and signed "T. Liebermann," *see* ECF No. 18-1, at 1, and another, sent on August 8, 2019, signed by Stern "[i]n the name of Mr. Liebermann," *id.* at 4. On May 21, 2019, Magid wrote to both Liebermann and Stern, requesting a decision in his favor. *See* ECF No. 18-2. Waldman grew suspicious that "Stern was making arguments against [his] interests to the Arbitrator," Waldman Decl. ¶ 31 and "confronted Stern," at which point Stern "admitted . . . that he was not acting as [Waldman's] advocate," *id.* ¶ 32.

On August 27, 2019 — nearly a year after Stern first sent an email signed in the Arbitrator's name — Stern met with Waldman and disclosed that "he was acting as a hybrid counselor to [the Arbitrator]," simultaneously advocating for both sides in the arbitration. *Id.* ¶¶ 33, 34; *see* ECF No. 18-3 ("Tr.").[1] Stern also admitted to receiving fees from both Waldman

---

[1] Petitioners argue that ECF No. 18-3, which Waldman represents to be an English translation of a recording of the August 27th conversation, is "inadmissible hearsay." ECF No. 26 ("Pets.' Reply"), at 10 n.3. But the Court considers it here only as evidence of Waldman's knowledge and, needless to say, Waldman cannot object to that use of the transcript for that

3

*and* Petitioners. *See* Waldman Decl. ¶ 35. Stern also confirmed or revealed (it is unclear whether Waldman already knew) that he had a familial relationship with one of Petitioners — namely, that he is Rottenberg's brother's father-in-law. *See* Tr. 38; Waldman Decl. ¶ 22. And Stern also confirmed or revealed (again, it is unclear whether Waldman already knew) that the Arbitrator owed him approximately $1.7 million. *See* Tr. 32; *see also* Waldman Decl. ¶¶ 44, 50.

On September 2, 2019, Waldman emailed the Arbitrator — without copying Petitioners — to complain about Stern's behavior and involvement with the arbitration. *See id.* ¶ 51. Specifically, Waldman alerted the Arbitrator to the fact that Stern had "tak[en] money from the other side" despite the fact that Stern "was hired and operated as [his] Toyen and lawyer." ECF No. 18-5 ("Waldman Email"), at 1. Waldman argued that "everything that transpired in the proceedings are now suspect" and that he "didn't have any representation" in the arbitration, which "was a precondition to [his] agreement to arbitrate." *Id.* Waldman further explained that "Rottenberg's brother is [Stern's] son in law" and alleged that Petitioners insisted on arbitrating before Liebermann because "they knew they would have everything set up beautifully to control, through Rabbi Stern, what was happening at the proceedings." *Id.* Accordingly, Waldman "insist[ed] that Rabbi Stern no longer be involved in any way in this arbitration." *Id.* at 2. And finally, Waldman explained that he had asked a friend of his "in the real estate industry" to help with his summation statement. *Id.* Waldman urged the Arbitrator to "ask [himself] . . . whether [Waldman] had proper representation in [the] proceedings." *Id.*

At roughly the same time that Waldman sent that email, he also sent the Arbitrator another email, copying Petitioners, with his summation statement. *Compare* ECF No. 24

---

purpose given that he himself submitted it to the Court. In any event, most, if not all, of the relevant information is included in Waldman's declarations.

4

("Rottenberg Decl."), at Ex. A, *with id.* at Ex. B.  According to Petitioners, that statement —
which has not been provided to the Court — "included a demand for . . . attorney's fees."
Rottenberg Decl. ¶ 34.  Waldman does not contend otherwise.  On September 16, 2019,
Waldman again emailed the Arbitrator, copying Petitioners, noting that it "ha[d] been two weeks
since [he] emailed [his] response" and asking the Arbitrator to "confirm that [he] received" it and
provide an update regarding "where we are up to."  Rottenberg Decl., at Ex. C.

On December 11, 2019,[2] the Arbitrator issued the Award in favor of Petitioners.  *See*
ECF No. 1, at Ex. B ("Award").  To the extent relevant here, the Arbitrator held that Waldman
must pay Petitioners $350,135.  Award 3.  He also stated that, "[i]f a court order, or any further
acts or proceedings, is necessary to confirm or enforce this award or collect on any judgment, the
court shall award attorneys' fees and costs to [Petitioners] for any fees and costs arising from the
proceeding to confirm and or enforce this award or any resulting judgment."  *Id.* at 3.  Five days
later, Petitioners filed their petition to confirm the Award.  *See* ECF No. 1.  On February 10,
2020, Waldman cross-petitioned to vacate the Award.

## LEGAL STANDARD

The parties disagree about the standards applicable to their petitions.  Petitioners argue
that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* provides the relevant standards.
*see* Pets.' Reply 5. Waldman, on the other hand, argues that the parties' dispute should be
governed by Article 75 of the New York Civil Practice Law and Rule ("NY CPLR"), as the
Agreement provides that "[t]he parties submit themselves to the personal jurisdiction of the
courts of the State of New York and/or New Jersey . . . for any action or proceeding to confirm

---

[2]   Although Petitioners state that the Award was "duly acknowledged and dated December 10, 2019," Pet. to Confirm ¶ 22, the Award is dated December 11, 2019.

5

or enforce a decree of the arbitrator pursuant to Article 75 of the [NY CPLR]."  Agreement; *see* ECF No. 19 ("Resp.'s Mem."), at 11.

The standards provided by the FAA and the NY CPLR are generally similar.  *Cf. Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 589 n.7 (2008) ("The text of the FAA was based upon that of New York's arbitration statute.").  Both sources of law provide that an arbitral award may be vacated if: (1) the arbitrator was partial, (2) the award was procured by corruption or fraud; (3) the arbitrator was guilty of misconduct; and (4) the arbitrator exceeded his or her power.  *See* 9 U.S.C. § 10(a); NY CPLR § 7511(b)(1).  Under both statutes, the court must confirm an award unless one of the statutory grounds for vacatur or modification is satisfied.  *See* 9 U.S.C. § 9; NY CPLR § 7510; *see also STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011).  Regardless of which law applies, "[c]ourts are reluctant to disturb the decisions of arbitrators lest the value of this method of resolving controversies be undermined."  *Matter of Goldfinger v. Lisker*, 500 N.E.2d 857, 859 (N.Y. 1986); *accord Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008).  And under both the FAA and the NY CPLR, the party seeking to vacate or modify an arbitral award bears a "heavy burden."  *Verille v. Jeanette*, 163 A.D.3d 830, 830-31 (2d Dep't 2018); *accord D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.").

Nevertheless, the relevant standards under the FAA and NY CPLR appear to differ in at least one respect relevant to this dispute.  Although a party seeking to vacate an award under the FAA "bear[s] a high burden of demonstrating objective facts inconsistent with impartiality," *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 105 (2d Cir. 2013) (internal quotation marks omitted), "the failure of an arbitrator to disclose facts which

6

reasonably may support an inference of bias is grounds to vacate the award" under the NY CPLR, *J.P. Stevens & Co. v. Rytex Corp.*, 312 N.E.2d 466, 467 (N.Y. 1974); *see also United House of Prayer for All People v. L.M.A. Int'l, Ltd.*, 107 F. Supp. 2d 227, 230 (S.D.N.Y. 2000) ("[C]ourts often hold that the 'appearance of impropriety' may not be sufficient to vacate an award under the FAA, while under CPLR 7511(b), as construed by the New York courts, the appearance of impropriety may be a sufficient or critical factor in vacating arbitration awards.").

Ultimately, however, the Court need not decide which law applies. For the reasons discussed below, Waldman's petition to vacate the Award in its entirety fails under either standard, and his petition to vacate the provision granting attorneys' fees succeeds under both.

## DISCUSSION

As noted, Waldman argues that the Award should be vacated in its entirety. *See* Resp.'s Mem. 11-15. In the alternative, he contends that it should be vacated to the extent that it requires him to pay to Petitioners any "attorneys' fees and costs" they incur in this proceeding. *See id.* at 15-18. The Court addresses each argument in turn.

### A. Vacatur of the Award in Its Entirety

Waldman argues that the Award should be vacated because the *ex parte* communications between Stern and the Arbitrator constituted misconduct and because the Award was tainted by fraud, corruption, and misconduct. *See id.* at 13. Each of these arguments is predicated on a few facts: (1) Stern held himself out to Waldman as his advocate; (2) Stern is one of the Petitioner's brother's father-in-law; (3) Stern took fees from both Waldman and Petitions; (4) Stern did not act solely in Waldman's interest; (5) Stern was the Arbitrator's law clerk; and (6) the Arbitrator was indebted to Stern. At bottom, therefore, Waldman's arguments amount to different versions of the same point: that the Arbitrator was not impartial. *See id.* at 14-15.

There is little doubt that if the standard of impartiality that applies to judges applied to arbitrators, the Arbitrator here would fall short. *See, e.g.*, *LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 467-68 (S.D.N.Y. 2017). But arbitrators, like the Arbitrator here, "are often chosen directly from the niche business communities whose disputes they are called upon to arbitrate," and in part for that reason "may have pre-existing relationships with one or both of the parties to an arbitration" that would be impermissible for judges. *Transportes Coal Sea de Venezuela C.A. v. SMT Shipmanagement & Transp. Ltd.*, No. 05-CV-9029 (KMK), 2007 WL 62715, at *3 (S.D.N.Y. Jan. 9, 2007). More specifically, under the FAA, a court may vacate an award only where the movant demonstrates "evident partiality" on the arbitrator's behalf — that is, that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) (internal quotation marks omitted). And to warrant vacatur under the NY CPLR, "it must be shown that the arbitrator and the party or witness have some ongoing relationship" and that the losing party suffered "prejudice to its rights as a result." *Henry Quentzel Plumbing Supply Co. v. Quentzel*, 193 A.D.2d 678, 679 (2d Dep't 1993).

Measured against these standards, it is not clear that the Arbitrator's relationship to Petitioners — namely, that the Arbitrator's law clerk, Stern, was the father of a Petitioner's brother's wife and that the Arbitrator had some sort of business relationship with Stern — crossed the line. *See, e.g.*, *Morelite Const. Corp. v. N.Y.C. Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 85 (2d Cir. 1984) (holding that a father-son relationship between a party and the arbitrator would be impermissible, but cautioning that "a list of familial or other relationships that will result in the *per se* vacation of an arbitration award . . . would most likely be very

8

short"). It was far more attenuated than, say, the relationship between the party and the arbitrator's clerk in *Beth Jacob Teachers Seminary Inc. v. Beis Chinuch Le'Bunos-Bas Melech*, No. 12218/08, 2009 WL 782549, at *3 (N.Y. Sup. Ct. Mar. 24, 2009), upon which Waldman relies, *see* Resp.'s Mem. 15. Nor does Waldman appear to demonstrate "peculiar commercial practices and factual variances" that would compel a reasonable person to conclude that the Arbitrator was partial. *Morelite*, 748 F.2d at 84; *see Scandinavian Reins.*, 668 F.3d at 72.

       Ultimately, however, the Court need not and does not resolve whether the Arbitrator's alleged partiality crossed the line because Waldman knew all of the relevant facts during the arbitration and did not adequately object on the grounds that he presses here. Courts have warned time and time again that a party may not seek vacatur "of an award based on a claim that it did not raise before the arbitrator" and about which it had full knowledge. *N.Y. Hotel & Motel Trades Council, AFL-CIO v. Hotel St. George*, 988 F. Supp. 770, 778 (S.D.N.Y. 1997). As the Second Circuit has explained: "Where a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that ground. His silence constitutes a waiver of the objection." *AAOT Foreign Ec. Ass'n (BO) Technostroyexport v. Int'l Dev. & Trade Servs, Inc.*, 139 F.3d 980, 982 (2d Cir. 1998) (internal quotation marks omitted); *accord J.P. Stevens & Co.*, 312 N.E.2d at 469 ("If a party goes forward with arbitration, having actual knowledge of the arbitrator's bias, or of facts that reasonably should have prompted further, limited inquiry, it may not later claim bias based upon the arbitrator."); *Eastman Assocs., Inc. v. Juan Ortoo Holdings, Ltd.*, 90 A.D.3d 1285, 1286 (3d Dep't 2011) (finding that a claim of partiality was waived because the party challenging the award "did not raise the issue of the arbitrator's partiality during the hearing").

That is the case here.  Notably, Waldman concedes that he was aware of all of the relevant facts no later than August 27, 2019, when he spoke with Stern.  *See generally* Resp.'s Mem. 3-10.  (The record suggests that he was aware of many of the relevant facts even before that, but the Court need not rely on that here.)  And yet, he continued with the arbitration.  Indeed, nearly a week later, on September 2, 2019, he sent the Arbitrator his summation statement.  *See* Rottenberg Decl. at Ex. B.  And two weeks after that, he followed up with the Arbitrator, asking him to confirm that he had received the summation statement and to provide an update regarding "where we are up to."  *Id.* at Ex. C.  Put simply, the evidence demonstrates that Waldman made a decision to "go[] forward with arbitration, having actual knowledge of the arbitrator's [alleged] bias, or of facts that reasonably should have prompted further, limited inquiry."  *J.P. Stevens & Co.*, 312 N.E.2d at 469; *cf. Ossman v. Ossman*, 166 A.D.2d 896, 896 (4th Dep't 1990) (vacating an arbitration award on the ground of partiality where the objecting party had explicitly asked the arbitrator to resign before he issued the award).  The fact that Waldman now regrets that decision does not mean that the Court may ignore it.

Waldman argues that he *did* object, citing the email that he sent to the Arbitrator at approximately the same time that he submitted his summation statement.  *See* ECF No. 35 ("Resp.'s Reply"), at 8-10.  It is true that Waldman alerted the Arbitrator in that email to some of the issues of which he now complains.  For instance, he informed the Arbitrator that he had "proof that [Stern] took money from" his adversaries.  Waldman Email 1.  He told the Arbitrator that he had evidence that Stern "was hired and operated as [his] Toyen and lawyer."  *Id.*  He noted that "Rottenberg's brother is [Stern's] son in law."  *Id.*  And he "insisted that . . . Stern no longer be involved" in the arbitration.  *Id.* at 2.  Significantly, however, Waldman's complaints related only to *Stern*; he raised no objection to *the Arbitrator's* partiality, which is the basis for

his arguments here. Indeed, conspicuously absent from Waldman's email is any reference to the Arbitrator's debt to Stern. Nor did Waldman request that the arbitration be halted or object to its continuation. To the contrary, in emails he sent the same day and thereafter, he pressed for a ruling in his favor. At most, therefore, Waldman's complaints about Stern appear to have been an effort to curry favor with the Arbitrator, not an objection to the Arbitrator himself.

None of that is to say that the proceedings in this case were a model of what alternative dispute resolution should be. At a minimum, the record suggests that Stern was playing both sides (indeed, *all* sides if one includes the Arbitrator) and, thus, Waldman may well have a legitimate grievance against *him* and against Rabinowitz for suggesting him. But Waldman clearly believed that the informality of the arrangement was to his advantage and, even after developing some doubts about Stern's role, he did not object to the Arbitrator issuing a decision. Having taken his chances, he cannot now be heard to complain just because the Award did not go his way. To hold otherwise would permit parties to informal arbitration arrangements of the sort hear to adopt a "heads I win, tails you lose" strategy. That is not the law and, thus, Waldman's arguments for vacatur of the Award in its entirety must be rejected.

## B. The Award of Attorney's Fees

By contrast, the Court concludes that Waldman's objection to the portion of the Award prospectively granting Petitioners' attorney's fees in *these* proceedings is well founded. Under the "American Rule," which applies to arbitrations, attorneys' fees are not recoverable "unless an award is authorized by agreement between the parties, statute[,] or court rule." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989); *see Sammi Line Co., Ltd. v. Altamar Navegacion S.A.*, 605 F. Supp. 72, 73-74 (S.D.N.Y. 1985) ("Since the traditional American rule is that attorneys' fees are generally not awarded, and the arbitrators may decide

only issues submitted for arbitration, the burden is on [the party seeking fees] to demonstrate that an award of attorneys' fees was included within the scope of the arbitrable issues."); *Chase Bank USA, N.A. v. Hale*, 19 Misc. 3d 975, 978 (N.Y. Sup. Ct. 2008) ("Generally, pursuant to the 'American Rule,' parties are to bear their own costs in litigation as well as in arbitration."). Here, it is undisputed that there is no statute or rule that justified an award of fees. Instead, Petitioners argue that the Arbitrator's award was justified either by the breadth of the parties' Agreement or because Waldman himself sought fees. *See* Pets.' Reply 18-20. But neither is sufficient to justify the award of fees for these proceedings as opposed to the arbitration itself.

Petitioners' first argument fails because, in the absence of an explicit agreement regarding fees, the Arbitrator's award required a finding of bad faith. *See, e.g.*, *ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*, 564 F.3d 81, 88 (2d Cir. 2009) (holding that the "exception" to the American rule for "bad-faith conduct" applied to arbitration because the "agreement . . . conferred broad authority on the arbitrators"). The Arbitrator, however, made no finding of bad faith, and Petitioners do not even attempt to argue that the record would support such a finding here — and for good reason. As for Waldman's own request for fees, there is no evidence that the request was for fees in *these* proceedings as opposed to the arbitration itself.[3] Yet, as Petitioners acknowledge, the Arbitrator "did not award . . . attorneys' fees incurred in the underlying dispute" — he awarded fees only for these proceedings. Pets.' Reply 20. Petitioners cite no authority for the proposition that in requesting fees for the arbitration, Waldman consented to the award of fees for enforcement proceedings after the arbitration. Absent such

---

[3] Notably, Petitioners did not file with the Court Waldman's summation statement in which he allegedly requested fees. That failure is curious, given that "the summation email was sent to [the Arbitrator] *and* Petitioners, but" Waldman's email regarding Stern — which Petitioners did file — "was sent to [the Arbitrator] only." Rottenberg Decl. ¶ 33.

authority (or evidence that Waldman himself requested such fees), the Court concludes that the Arbitrator exceeded his authority by awarding Petitioners attorney's fees for these proceedings.

## CONCLUSION

For the foregoing reasons, both the petition to confirm the Award and the motion to vacate it are GRANTED in part and DENIED in part. Specifically, the Award is confirmed except to the extent that it provides attorneys' fees to Petitioners.

The Clerk of Court is directed to terminate ECF No. 15 and to close this case.

SO ORDERED.

Dated: August 19, 2020
New York, New York

JESSE M. FURMAN
United States District Judge